**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

```
_____
                              :
HERIBERTO BATIZ,              :
                              :   Civil Action No. 09-2849 (RBK)
            Plaintiff,        :
                              :
       v.                     :          O P I N I O N
                              :
MANUEL CALAGUIO, et al.,      :
                              :
            Defendants.       :
_____:
```

**APPEARANCES:**

Heriberto Batiz, Plaintiff, <u>Pro</u> <u>Se</u>
# 14875-014
MDC Brooklyn
P.O. Box 329002
Brooklyn, NY 11232

Karen H. Shelton
Assistant U.S. Attorney
Office of the U.S. Attorney
402 East State Street
Trenton, NJ 08608
Attorney for Defendants

**KUGLER, District Judge**

The remaining defendants in this matter, Calaguio, Syjontian, Patel and Turner-Foster, (hereinafter the "medical defendants") have filed a Motion for Summary Judgment (docket entry 29). Plaintiff has not opposed the motion. The Court has reviewed the motion and decided it without oral argument, pursuant to Federal Rule of Civil Procedure 78.

For the reasons that follow, the Court will grant the medical defendants' motion.

<u>**BACKGROUND**</u>

Plaintiff's complaint, requesting damages pursuant to <u>Bivens v. Six Unknown Agents of the Fed. Bureau of Narcotics</u>, 403 U.S. 388 (1971), was submitted to the Court on June 11, 2009. Plaintiff states that on October 14, 2008, while housed at the Federal Correctional Institution (FCI) at Fort Dix, New Jersey, he "seriously wrenched his back when lifting a computer, weighing about 30 pounds, at his job site, Federal Prison Industries, Inc. (FPI)." Plaintiff's complaint describes the treatment he received for the injuries. Plaintiff complains that he had an MRI but was not able to discuss the results with a doctor, was not permitted to have surgery, and was not permitted to have physical therapy. Also, Plaintiff complains that he had a prior condition that should have been made aware to the Federal Prison Industries, which made him dizzy when on medication, further exacerbating his injuries. Also, sick calls were ignored in November of 2008, and despite his injuries worsening, he has been denied treatment. Plaintiff noted that he feared becoming disabled, and asked for monetary damages.

On August 5, 2009, this Court ordered summonses issued. Defendants filed a motion to dismiss, in lieu of an answer. On September 18, 2010, the motion was granted as to defendants FCI,

FPI, James, Meyers, Eobstel, Grandolsky, and Spaulding.  The motion was denied as to the medical defendants.  On October 7, 2010, the medical defendants filed an answer to the complaint, and on March 28, 2011, filed the instant motion for summary judgment.

The medical defendants' motion for summary judgment asserts that Plaintiff was treated for his injuries, and that the defendants were not deliberately indifferent to his medical needs in violation of the Eighth Amendment.  The Declaration of Turner-Foster, attached to the motion, outlines the treatment Plaintiff received, and includes Plaintiff's medical records as exhibits.

Plaintiff has not opposed the motion, or filed any other papers on the docket of this case.  In fact, according to the Bureau of Prisons' inmate locator website, it appears that Plaintiff was released from custody in July of 2011.  He has not filed any address change with the Clerk of the Court, as required by the Local Civil Rules.  As this motion was filed in March of 2011, well before Plaintiff was released, and the medical defendants filed a certificate of service evidencing service on Plaintiff, this Court assumes that Plaintiff received the motion prior to his release.

**DISCUSSION**

**A.   Standard of Review for Defendants' Motion for Summary Judgment.**

Summary judgment is appropriate where the Court is satisfied that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986).  A genuine issue of material fact exists only if the evidence is such that a reasonable jury could find for the nonmoving party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  When the Court weighs the evidence presented by the parties, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Id. at 255.

The burden of establishing the nonexistence of a "genuine issue" is on the party moving for summary judgment.  See Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1080 (3d Cir. 1996). The moving party may satisfy its burden either by "produc[ing] evidence showing the absence of a genuine issue of material fact" or by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." Celotex, 477 U.S. at 325.

Once the moving party satisfies this initial burden, the nonmoving party must "set out specific facts showing a genuine

4

issue for trial." Fed. R. Civ. P. 56(e).  To do so, the
nonmoving party must "do more than simply show that there is some
metaphysical doubt as to the material facts."  Matsushida Elec.
Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).
Rather, to survive summary judgment, the nonmoving party must
"make a showing sufficient to establish the existence of [every]
element essential to that party's case, and on which that party
will bear the burden of proof at trial."  Celotex, 477 U.S. at
322.  Furthermore, "[w]hen opposing summary judgment, the
nonmovant may not rest upon mere allegations, but rather must
'identify those facts of record which would contradict the facts
identified by the movant.'"  Corliss v. Varner, 247 F. App'x 353,
354 (3d Cir. 2007) (quoting Port Auth. of N.Y. & N.J. v.
Affiliated FM Ins. Co., 311 F.3d 226, 233 (3d Cir. 2002)).

In deciding the merits of a party's motion for summary
judgment, the court's role is not to evaluate the evidence and
decide the truth of the matter, but to determine whether there is
a genuine issue for trial.  See Anderson, 477 U.S. at 249.
Credibility determinations are the province of the factfinder,
not the district court.  See BMW, Inc. v. BMW of N. Am., Inc.,
974 F.2d 1358, 1363 (3d Cir. 1992).

The Court is mindful that it must carefully review the
unopposed record to see if the medical defendants are entitled to
judgment as a matter of law, notwithstanding Plaintiff's silence

See Anchorage Assoc. v. Virgin Islands Bd. of Tax Rev., 922 F.2d 168, 175 (3d Cir. 1990).  Summary judgment can only be granted "if appropriate."  Fed. R. Civ. P. 56(e).

B.    **The Medical Defendants' Motion Must Be Granted.**

    1.    Eighth Amendment Medical Care Standard

    The Eighth Amendment to the United States Constitution prohibits the infliction of "cruel and unusual punishments" on those convicted of crimes.  See Rhodes v. Chapman, 452 U.S. 337, 344-46 (1981).  This proscription against cruel and unusual punishment requires that prison officials provide inmates with adequate medical care.  See Estelle v. Gamble, 429 U.S. 97, 103-04 (1976).  In order to set forth a cognizable claim for a violation of his right to adequate medical care, an inmate must allege: (1) a serious medical need; and (2) behavior on the part of prison officials that constitutes deliberate indifference to that need.  See id. at 106.

    To satisfy the first prong of the Estelle inquiry, the inmate must demonstrate that his medical needs are serious. "Because society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'"  Hudson v. McMillian, 503 U.S. 1, 9 (1992).  Serious medical needs include those that have been diagnosed by a physician as requiring treatment or that are so

6

obvious that a lay person would recognize the necessity for a doctor's attention, and those conditions which, if untreated, would result in lifelong handicap or permanent loss.  See Monmouth County Correctional Institutional Inmates v. Lanzaro, 834 F.2d 326, 347 (3d Cir. 1987), cert. denied, 486 U.S. 1006 (1988).

The second element of the Estelle test requires an inmate to show that prison officials acted with deliberate indifference to his serious medical need.  "Deliberate indifference" is more than mere malpractice or negligence; it is a state of mind equivalent to reckless disregard of a known risk of harm.  See Farmer v. Brennan, 511 U.S. 825, 837–38 (1994).  Furthermore, a prisoner's subjective dissatisfaction with his medical care does not in itself indicate deliberate indifference.  See Andrews v. Camden County, 95 F. Supp.2d 217, 228 (D.N.J. 2000).

Similarly, "mere disagreements over medical judgment do not state Eighth Amendment claims."  White v. Napoleon, 897 F.2d 103, 110 (3d Cir. 1990).  "Courts will disavow any attempt to second-guess the propriety or adequacy of a particular course of treatment ... [which] remains a question of sound professional judgment.  Implicit in this deference to prison medical authorities is the assumption that such informed judgment has, in fact, been made."  Inmates of Allegheny County Jail v. Pierce, 612 F.2d 754, 762 (3d Cir. 1979) (internal quotation and citation

omitted) (emphasis added).  Even if a doctor's judgment concerning the proper course of a prisoner's treatment ultimately is shown to be mistaken, at most what would be proved is medical malpractice and not an Eighth Amendment violation.  See Estelle, 429 U.S. at 105-06; White, 897 F.2d at 110.

    "Where prison authorities deny reasonable requests for medical treatment, however, and such denial exposes the inmate 'to undue suffering or the threat of tangible residual injury,' deliberate indifference is manifest.  Similarly, where 'knowledge of the need for medical care [is accompanied by the] ... intentional refusal to provide that care,' the deliberate indifference standard has been met....  Finally, deliberate indifference is demonstrated '[w]hen ... prison authorities prevent an inmate from receiving recommended treatment for serious medical needs or deny access to a physician capable of evaluating the need for such treatment."  Lanzaro, 834 F.2d at 346 (citations omitted).  "Short of absolute denial, if necessary medical treatment [i]s ... delayed for non-medical reasons, a case of deliberate indifference has been made out."  Id. (citations omitted).  "Deliberate indifference is also evident where prison officials erect arbitrary and burdensome procedures that 'result[ ] in interminable delays and outright denials of medical care to suffering inmates.'"  Id. at 347 (citation omitted).

8

2.   <u>Plaintiff's Treatment</u>

The record provided to this Court evidences that the Plaintiff was extensively treated for his injuries, and does not demonstrate deliberate indifference on the part of the medical defendants.

It appears from the record that after transfer to Fort Dix on January 29, 2008, Plaintiff had a medical screening, and reported a history of lower back pain. He was prescribed pain medication.  <u>See</u> Defendants' Brief ("Defs. Br."), p.3; Turner-Foster Declaration, ¶ 7.

On October 14, 2008, while designated at FCI Fort Dix, Batiz reported an injury to Health Services staff and complained of severe pain in his lower back.  Def. Br., p. 3-4; <u>Id.</u> at ¶ 8. He was provided with an injection of Nubain, a strong pain medication, and was advised to follow-up as needed.  Defs. Br., p. 4; <u>Id.</u> ¶ 9.

On October 15, 2008, the next day, a follow-up encounter was performed by MLP Calaguio.  Batiz reported a history of lower back pain and claimed his sagging mattress exacerbates the issue. He was advised to apply a warm compress on and off every 20 minutes, or to use Bengay ointment from Commissary.  He was also instructed to do warm-up exercises.  Batiz was provided Tylenol and topical cream for pain.  He was also advised that it was too

soon to receive a second Nubain injection.  Defs. Br., p. 4; Id.
at ¶ 9.

On October 17, 2008, two days after Plaintiff reported his
injury, MLP Syjongtian responded to an emergency call in Unit
5711.  Batiz was laying on the floor and complained of extreme
back pain.  He indicated that his leg gave out due to back pain
and he fell to the floor.  Batiz was provided a Nubain injection
for the immediate pain, and a cane to assist him in ambulating.
Batiz was informed to follow-up at Sick Call, or to report
immediately if his condition worsened.  Defs. Br., pp. 4-5; Id.
at ¶ 10.

On October 27, 2008, Batiz reported to Sick Call and
was seen by MLP Synjongtian.  He requested an MRI and a re-fill
of his Zantac medication, prescribed for acid reflux.  The MLP
requested an MRI of the Spine and Pelvis due to the history of
lower back pain and the new injury.  Defs. Br., p. 5; Id. at ¶
11.

Three days later, on October 30, 2008, Batiz reported to
Sick Call.  This time he was seen by MLP Elias and complained of
severe lower back pain.  He stated he was treated with Tylenol
and Nubain, but they did not help.  MLP Elias noted that an MRI
was already requested.  Batiz was advised to apply a warm
compress and Bengay ointment twice daily.  He was prescribed
Indomethacin, a non-steroidal anti-inflammatory drug (NSAID), for

his pain.  He was also put in Convalescent Status, also referred
to as a "work idle."  Defs. Br., pp. 5-6; Id. at ¶ 12.

A week later, the Utilization Review Committee (URC),
approved the MRI for Batiz on November 7, 2008.  The MRI was to
be completed within three months.  Defs. Br., p. 6; Id. at ¶ 13.

On November 12, 2008, Batiz again went to Sick Call and
was treated by MLP Claguio.  Batiz complained of lower back pain,
and stated it was worse with his sagging mattress.  He stated he
was relieved by the NSAID or the injectable Nubain.  He was
prescribed Ibuprofen for pain.  The MLP placed a note in the file
suggesting an evaluation by an Orthopedic doctor, if the results
of the x-ray and MRI prove degenerative changes.  He also
indicated that an NSAID, injectable Nubain, or Ketorolac may be
prescribed for short-term extreme pain.  Defs. Br., p. 6; Id. at
¶ 14.

On November 17, 2008, Batiz received an MRI of the
Pelvis and Lumbar Spine.  The results were unremarkable for the
pelvis.  The Lumbar Spine showed degenerative disc changes in the
L4-5 and L5-S1.  He had slight disc bulging, and posterior facet
hypertrophy at L5-S1.  The results indicated that Batiz has
osteoarthritis (thickening of the ligaments).  He did not have
spinal cord stenosis (narrowed spinal cord) and did not have

compression of the nerves, which , in Dr. Turner-Foster's opinion, would indicate the need for possible surgical intervention.  Defs. Br., pp. 6-7; Id. at ¶ 15.

On December 1, 2008, Batiz was evaluated by his Primary Care Provider at the time, Dr. Patel.  Batiz indicated he wanted a brand name medication and requested a work idle.  The doctor noted Batiz ambulated with a cane.  He was able to get on the examination table without help and mediocre pain.  Batiz was advised to use a warm compress and Bengay twice daily.  Dr. Patel discontinued the Ibuprofen and prescribed Codeine and Piroxicam daily.  Dr. Patel also provided Batiz a work idle.  Lastly, he was instructed to perform exercises.  Defs. Br., p. 7; Id. at ¶ 16.

On December 10, 2008, Batiz attended Sick Call and was seen by MLP Syjongtian.  Batiz reported that the medication prescribed by Dr. Patel did not help, and he wanted more "potent" medication.  Doctor Patel reviewed his medication and discontinued the Codeine, and prescribed Oxycodone.  Defs. Br., pp. 7-8; Id. at ¶ 17.

On January 12, 2009, Batiz did not appear for his Sick Call appointment.  Defs. Br., p. 8; Id. at ¶ 18.  On January 14, 2009, Batiz went to Sick Call and was seen by Physician Assistant Gostowski.  Batiz requested a refill of Percocet and was advised that the MRI results did not justify narcotics (such as Percocet

and Oxycodone) because those medications are typically used to treat acute conditions. He was instructed that exercise would build his strength and flexibility. He was also provided with a realistic time-frame for improvement of his condition. Defs. Br., p. 8; Id. at ¶ 19.

On January 16, 2009, Batiz reported to Health Services due to an alleged injury. He claimed he slipped down the stairs in his Unit due to his new medication being too strong. MLP Calaguio noted Batiz was walking the same as the week prior, had no signs of bruising, redness, and no skin discoloration. The MLP informed Batiz to use a warm compress and to take the Keppra at pill line as prescribed. He also instructed Batiz to lay down when necessary and to follow-up at Sick Call. Defs. Br., p. 8; Id. at ¶ 20.

On January 27, 2009, Batiz reported to Sick Call and was seen by MLP Calaguio. He reported that the Keppra made him dizzy. He stated that he discontinued the mediation because of the side-effects, and that his back was in pain. The MLP renewed Batiz's prescription for Piroxicam for pain, and prescribed him Meclizine, for his dizziness. Defs. Br., p. 9; Id. at ¶ 21.

On February 18, 2009, an Administrative Note from the Chief Pharmacist was placed in Batiz's medical records. Batiz reported that the MLP agreed to decrease the dosage of Keppra, however, the medical records did not indicate this. Pharmacist

13

decreased the dosage for Keppra and referred Batiz to the MLP for follow-up.  Defs. Br., p. 9; Id. at ¶ 22.

On February 23, 2009, Batiz was seen at Sick Call by PA Gostkowski.  Batiz reported that he was given "seizure" medication to treat his complaint of pain.  Batiz was instructed that medications such as Keppra can be used to treat pain, in addition to their other uses.  Batiz became loud and belligerent, and left the office before the examination could be completed. Defs. Br., p. 9; Id. at ¶ 23.

Dr. Turner-Foster examined Batiz on March 3, 2009 as part of his Chronic Care Clinic visit.  He reported back pain for five months and complained of lower back pain that radiated down his right leg.  He admitted to the sensation of burning pins and needles.  Dr. Turner-Foster noted that these symptoms were consistent with compression of the sciatic nerve by a spasmed muscle.  The results of the November 2008 MRI were again reviewed with Batiz.  The treatment plan was to discontinue Keppra and Piroxicam because of the reported dizziness and bleeding problems.  Dr. Turner-Foster ordered a trial of Topamax.  Batiz was instructed that if a higher dose of Topamax was necessary, to report this to the pharmacist at pill line.  The importance of exercise was reiterated.  Defs. Br., p. 10; Id. at ¶ 24.

On March 19, 2009 another Administrative Note was placed in Batiz's medical record by the Chief Pharmacist.  Batiz

14

reported to the Pharmacist that Topamax at 25 mg was insufficient to control the pain.  The Pharmacist sent an e-mail to the Doctor, who prescribed Topamax, 50 mg, for pill line.  Defs. Br., p. 10; Id. at ¶ 25.

On July 20, 2009, Batiz reported to Sick Call and was treated by PA Esposito.  Batiz reported no extreme pain.  He asked if there was any other medication to prescribe for his lower back pain.  The PA indicated there may be other prescriptions he could purchase through the Commissary.  Defs. Br., p. 10; Id. at ¶ 26.

On July 27, 2009, Batiz again reported to Sick Call and was treated by MLP Gostowski.  Batiz stated his pain medication was ineffective.  It was noted he was still prescribed Topamax. The MLP indicated Batiz needed to follow-up with his Primary Care Physician.  He also indicated he would e-mail the Pharmacy in order for him to be reviewed for the Pain Management Clinic. Defs. Br., p. 11; Id. at ¶ 27.

An Administrative Note was entered in the file on August 24, 2009 by PA Esposito.  He indicated that Batiz refused counseling and care.  PA Esposito reviewed Batiz's MRI with him extensively.  Batiz did not want to listen, and only asked for medication repeatedly.  The note indicated Batiz believed Health Services was refusing him medical care and he threatened to file administrative remedies.  Defs. Br., p. 11; Id. at ¶ 28.

15

On September 8, 2009, Batiz was evaluated by Dr. Lopez De Lasalle, the Clinical Director at FCI Fort Dix, for his Chronic Care Clinic appointment.  At his evaluation, Batiz reported that he was disabled prior to being incarcerated due to mental health issues.  He requested pain medication for his lower back.  Batiz refused the Topamax, 50 mg, so Dr. Lopez De Lasalle discontinued that medication.  Instead, he was prescribed Amitriptyline, 25 mg, for neuroliptic pain management, to be taken at pill line.  Defs. Br., p. 11; Id. at ¶ 29.

Dr. Turner-Foster states in her Declaration that there was no indication from the November 2008 MRI, or from the previous MRI and x-rays, to refer Batiz to an Orthopedic Surgeon or Neurosurgeon.  In order to refer an individual to either specialist, the MRI must show that there is an issue to surgically correct.  As previously indicated, the November 2008 MRI showed no compression on the nerves.  Individuals with Batiz's condition are typically treated medically, with pain medications, and not surgically.  She opines that Batiz was treated appropriately with pain medication from the Bureau of Prisons' approved formulary of medication.  Defs. Br., p. 12; Id. at ¶ 31.

3.   <u>The Medical Defendants Were Not Deliberately
Indifferent.</u>

As demonstrated by the records provided in this case,
Plaintiff's injury was treated extensively by the medical
defendants.  At best, Plaintiff disagrees with the treatment
course set forth by the medical defendants.  As noted, however,
such claims of disagreement in treatment, or negligence, or
medical malpractice, do not rise to the level of an Eighth
Amendment violation.

Here, the medical record as a whole does not support an
Eighth Amendment violation.  Plaintiff was placed on "work idle,"
and was given a cane to help his pain.  He was seen regularly and
repeatedly at sick call, was given an MRI, and was treated with
medication and informed about the importance of exercise.  While
this Court sympathizes with Plaintiff's serious medical
condition, it is clear that the medical defendants were not
deliberately indifferent to his medical needs.

<b><u>CONCLUSION</u></b>

For the foregoing reasons, the medical defendants' Motion
for Summary Judgment is granted.

An appropriate Order follows.


                              s/Robert B. Kugler
                              ROBERT B. KUGLER
                              United States District Judge

Dated: December 12, 2011

17